198 S.E.2d 575 (1973)
19 N.C. App. 263
STATE of North Carolina ex rel. COMMISSIONER OF INSURANCE and the North Carolina Compensation Rating and Inspection Bureau
v.
STATE of North Carolina ex rel. ATTORNEY GENERAL.
No. 73101NS493.
Court of Appeals of North Carolina.
August 29, 1973.
Certiorari Denied and November 1, 1973.
*577 Allen, Steed & Pullen, by Arch T. Allen, and Thomas W. Steed, Jr., Raleigh, for plaintiff appellee the North Carolina Compensation Rating and Inspection Bureau.
Atty. Gen., Robert Morgan, by Asst. Atty. Gen., Charles A. Lloyd, Raleigh, for intervenor appellant.
Certiorari Denied and Appeal Dismissed November 1, 1973.
BALEY, Judge.
The statutory method for judicial review of decisions by the Commissioner of Insurance concerning insurance rates is set out in G.S. § 58-9.4 through G.S. § 58-9.6.
G.S. § 58-9.4 provides in part:
". . . Any order or decision of the Commissioner, if supported by substantial evidence, shall be presumed to be correct and proper. . . ."
G.S. § 58-9.6(e) sets out:
"Upon any appeal, the rates fixed or any rule, regulation, finding, determination, or order made by the Commissioner under the provisions of this Chapter shall be prima facie correct."
The position of the Attorney General is that there is no substantial evidence supporting the Commissioner's approval of the rate increase in the present case. In particular, he contends that the Commissioner *578 was not supported by substantial evidence in determining that the insurance company should be allowed a profit figure equal to 2.5% of the total premiums received. In our judgment there is substantial evidence to support the decision of the Commissioner, and it is affirmed.
The standard of "substantial evidence" is widely used in judicial review of administrative decisions. It has been defined by the North Carolina Supreme Court as "more than a scintilla or a permissible inference." Utilities Commission v. Trucking Co., 223 N.C. 687, 690, 28 S. E.2d 201, 203. The United States Supreme Court has interpreted it as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938), and has stated that "it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939). See generally 4 K. Davis, Administrative Law Treatise, §§ 29.01-.06. In the application of the "substantial evidence" standard courts will generally defer to the expertise of the administrator in his specialized field if there is reasonable evidence to support his decision.
Here the expert witness Roy Kallop, a workmen's compensation insurance actuary, testified in detail at the public hearing as to the procedure used by the Bureau in arriving at the increased rate. He stated that this procedure involved determining the total amount of premiums received by the companies over a year-long period and their yearly losses (payments on claims by policyholders) and loss adjustment expense. It involved adjusting these figures to reflect current premium rates and benefit levels and determining the proportion of total premiums received which is paid out by the companies in losses and loss adjustment expense. Detailed charts (based on policies taking effect during the twelve-month periods beginning 1 August 1968 and 1 August 1969) were submitted at the hearing, showing that in North Carolina, at the present premium rates, losses and loss adjustment expense would take up such a large proportion of total premiums (67.9%) that, when other company expenses and taxes (amounting to 31.1% of total premiums) were added, the amount remaining for the companies' profit would be less than 2.5% on premium receipts. Additional charts, based on more recent data involving all policies in effect in the twelve-month period beginning 1 July 1971, likewise indicated that present premium levels were inadequate. Kallop testified that the Bureau's procedure for determining rate levels had been followed for many years, was generally accepted throughout the United States, and was brought up to date by review each year by the National Council on Compensation Insurance. As to the validity of setting the companies' profit at 2.5% of total premiums received, Kallop testified in his opinion as an expert that the 2.5% figure is "a minimum profit allowance," that it "has been adhered to for many years," that it is followed in all states except California, that it is not a guaranteed profit since it also covers contingencies such as unforeseeably high losses, that "the profit allowance is less than what it is in other [types of insurance] because this is a highly regulated line," that it "is a minimum factor that is necessary to attract capital," that "[a]fter taxes the 2.5 is reduced to 1.3," and that the 2.5% allowance is reasonable and "eminently fair."
In In re Filing by Automobile Rate Office, 278 N.C. 302, 180 S.E.2d 155, it was held that hearings before the Commissioner are not within the scope of G.S. §§ 143-317 and 318, requiring administrative agencies to consider only evidence that would be admissible in court. The Commissioner is free to hear "`all evidence of any type having reasonable probative value,'" including "`[a]ny evidence of the type upon which responsible persons are *579 accustomed to rely in the conduct of insurance affairs.'" 278 N.C. at 318, 180 S.E. 2d at 166, quoting Rules and Regulations for Public Hearings, promulgated by the Insurance Advisory Board in 1950.
The testimony of Kallop, along with the charts presented at the Commissioner's hearing, seems clearly to come within the standard of admissibility established in the Automobile Rate case, and to provide more than a scintilla of evidence supporting the validity of the 2.5% profit allowance and of the increased premium rates. If these issues were being submitted to a jury, the judge would not be justified in directing a verdict that the profit allowance or the rate increase was improper. Thus both the Commissioner's determination that 2.5% is an appropriate profit figure, and his ultimate decision that the rate increase was fair and reasonable, are supported by substantial evidence and should be upheld.
However, the Attorney General has raised three additional issues, each of which, he contends, requires reversal of the Commissioner's decision. First, he insists that the Commissioner should have required the presentation of evidence relating to the amount of capital necessary to engage in the workmen's compensation insurance business in North Carolina and the rate of return needed to attract such investment capital. This contention has been rejected in several North Carolina cases. In re Filing by Automobile Rate Office, 278 N.C. 302, 314-315, 180 S.E.2d 155, 164; In re Filing by Fire Ins. Rating Bureau, 275 N.C. 15, 38, 165 S.E.2d 207, 223; Comr. of Insurance v. Attorney General, 16 N.C.App. 724, 729, 193 S.E.2d 432, 435. Evidence of this type is commonly used in fixing utility rates. See, e. g., Utilities Comm. v. Telephone Co., 281 N.C. 318, 189 S.E.2d 705, noted in 51 N.C.L.Rev. 1140. It is much less relevant in determining insurance rates, because as the Court explained in the Automobile Rate Office case, an insurance company "has no significant inventory of assets which are used and useful in the prosecution of its business. The primary function of such a company is to render a service." 278 N.C. at 315, 180 S.E.2d at 164. Utility companies own large quantities of expensive equipment, which is necessary for them to provide their services. To purchase this equipment, large amounts of capital must be invested; and thus it is possible to determine utility rates by reference to the amount of capital invested in the company and the fair value of its property. Insurance companies, on the other hand, do not require so much costly equipment or so large a capital investment. The importance of the service they provide is not in proportion to the value of their property or the amount of their capital investment. For this reason the courts have determined that proper profit levels for insurance companies may be more appropriately ascertained by taking a percentage of their premiums than by specifying a certain rate of return on their capital investment.
Second, the Attorney General contends that the Commissioner should have required the Bureau to submit for his consideration information on expenses actually incurred by the companies in North Carolina. Instead of requiring a separate listing of North Carolina expenses, the Commissioner used countrywide expense information. This was not an error on the Commissioner's part. According to Kallop's testimony, breaking down the countrywide expense figures by state and providing separate figures for North Carolina would have required a great deal of time and expense, and there would have been little gain in accuracy. The expenses involved here are for items such as the salaries of company employees. Most workmen's compensation insurers do business in many states, and a company employee may deal with transactions from several states in the course of a day. The employee is not paid any more or any less while working on a North Carolina transaction than while working on a matter from another state. *580 These expenses tend to be uniform from state to state, and therefore a state-by-state breakdown would result in figures differing very little from those the Commissioner obtained by using the countrywide data. Claim adjustment expenses, which might vary significantly from state to state, are in a different category and are computed separately for each state.
It is true that in the Automobile Rate Office case, the Supreme Court construed G.S. § 58-248 (1965), as amended, G.S. § 58-248 (Supp.1971), to require the Commissioner to consider North Carolina rather than countrywide expense data in fixing automobile liability insurance rates. It is also true that G.S. § 97-104, dealing with workmen's compensation insurance, is worded almost identically with G.S. § 58-248 as it was worded in April 1971 when the Automobile Rate Office case was decided.
The relevant portions of G.S. § 58-248 in April 1971 were as follows:
"[T]he Commissioner of Insurance is hereby authorized to compel the production of all books, data, papers and records and any other data necessary to compile statistics for the purpose of determining the pure cost and expense loading of automobile bodily injury and property damage insurance in North Carolina and this information shall be available and for the use of the North Carolina Automobile Rate Administrative Office for the . . . promulgation of rates on automobile bodily injury and property damage insurance."
The relevant portions of G.S. § 97-104, now in effect, read as follows:
"[T]he Insurance Commissioner is hereby authorized to compel the production of books, data, papers, and records relating to or bearing upon such data as is necessary to compile statistics for the purpose of determining the pure cost and expense loading of workmen's compensation insurance in North Carolina and this information shall be available and for the use of the Compensation Rating and Inspection Bureau, for the . . . promulgation of rates on workmen's compensation insurance."
Although the two statutes are very similar, nevertheless it seems appropriate to construe G.S. § 97-104 so as not to require the use of North Carolina expense data. Workmen's compensation insurance is almost entirely an interstate business, and it is difficult to allocate transactions to one state rather than another. Almost all workmen's compensation insurers doing business in North Carolina are multi-state corporations; in addition, in workmen's compensation insurance the insured also is often a multi-state corporation, whereas the typical automobile liability insurance policyholder is an individual. Even with respect to automobile liability insurance, the General Assembly apparently determined that the policy of requiring North Carolina expense data was an unsatisfactory one, for less than four months after the Automobile Rate Office case was decided, G.S. § 58-248 was amended so as to eliminate the phrase "in North Carolina". Ch. 1115, § 3, [1971] N.C.Sess.L. 1667.
G.S. § 97-104 authorizes but does not compel the Commissioner to require the production of expense data in North Carolina, and if he decides, in his discretion, that a quick, inexpensive and reasonably accurate method of "determining the . . . expense loading of workmen's compensation insurance in North Carolina" is to take a proportional part of the countrywide total, he is free to do so. Such an interpretation does no violence to the language of the statute and would appear practical and realistic when applied to the workmen's compensation insurance business.
Third, the Attorney General contends that the Commissioner erred in failing to request and consider evidence concerning the amount of investment income received by the companies. In Comr. of Insurance v. Attorney General, 16 N.C. *581 App. 724, 193 S.E.2d 432, a case involving automobile physical damage insurance, a similar argument was made. The Court rejected the argument, pointing out that whereas G.S. § 58-246(5) specifically requires that the Commissioner be furnished with data on investment income when he is considering automobile liability insurance rates, the statutes dealing with physical damage insurance contain no such requirement. Instead, the Court said, the physical damage insurance statute merely "requires the Commissioner to determine whether the rates charged are adequate to produce a fair and reasonable profit. This, it seems to us, refers to underwriting profit and does not include investment income." 16 N.C.App. at 728-729, 193 S.E.2d at 435 (emphasis by the Court). The analogous workmen's compensation insurance statute is G.S. § 97-104.1, which reads as follows:
"Whenever the Commissioner . . . shall determine, after notice and a hearing, that the rates charged or filed on any class of risks are excessive, inadequate, unreasonable, unfairly discriminatory, or otherwise not in the public interest, or that a classification or classification assignment is unwarranted, unreasonable, improper or unfairly discriminatory he shall issue an order to the Bureau directing that such rates, classifications or classification assignments be altered.. . ."
No mention is made of investment income. Like the physical damage insurance statute, G.S. § 97-104.1 requires only that the rates charged not be excessive or unreasonable. Under Comr. of Insurance v. Attorney General, supra, the Commissioner is not required to consider investment income received by the workmen's compensation insurers. It appears, however, from the evidence presented that investment income from the unearned premium and loss reserves was taken into consideration in the establishment of the 2.5% allowance for profit and contingencies.
We are of the opinion that the objections made by the Attorney General should be overruled. The conclusions reached by the Commissioner of Insurance are supported by substantial evidence. His decision approving the rate increase of 3.4% for workmen's compensation insurance is affirmed.
Affirmed.
BROCK, C. J., and VAUGHN, J., concur.