STATE OF NORTH CAROLINA EX REL. COMMISSIONER OF INSURANCE v. NORTH CAROLINA RATE BUREAU, NORTH CAROLINA REINSURANCE FACILITY, NATIONWIDE MUTUAL INSURANCE COMPANY, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, THE AETNA CASUALTY AND SURETY COMPANY, LUMBERMENS MUTUAL CASUALTY COMPANY, GREAT AMERICAN INSURANCE COMPANY, THE TRAVELERS INDEMNITY COMPANY, UNITED STATES FIRE INSURANCE COMPANY AND THE SHELBY MUTUAL INSURANCE COMPANY

No. 7810INS625

(Filed 5 June 1979)

1. **Insurance § 79.3— disapproval of rate filing—findings**

    The Commissioner of Insurance complied with the requirement of G.S. 58-124.21(a) that he indicate in his order disapproving a rate filing "wherein and to what extent such filing is deemed to be improper" where he set out 99 findings of fact and 32 conclusions of law detailing the improprieties he found in the filing.

2. **Insurance § 79.1— rate case—burden of proof**

    G.S. 58-124.21 did not transfer the burden of proof in a rate case to the Commissioner of Insurance.

3. **Insurance § 79.2— automobile insurance rate filing—challenge of unaudited data—absence of notice to Rate Bureau**

    The Commissioner of Insurance did not fail to comply with G.S. 58-124.21(a) by failing to give written notice to the Rate Bureau that he intended to challenge the data in an automobile insurance rate filing as unreliable because it was unaudited where it did not appear in the filing that the data was unaudited.

4. **Insurance § 79.2— automobile insurance rate filing—unreliability of unaudited data**

    A determination by the Commissioner of Insurance that unaudited data was not reliable as a basis for justifying a change in automobile insurance rates was supported by material and substantial evidence.

5. **Insurance § 79.2— automobile insurance rates—underwriting profit—consideration of investment income**

    In an automobile insurance rate hearing, the Commissioner of Insurance could properly consider investment income in determining a reasonble underwriting profit margin, but the Commissioner erred in requiring that investment income be considered at a risk-free rate of return. G.S. 58-79.1.

6. **Insurance § 79.3— automobile insurance rates—differential for risks ceded to Reinsurance Facility—unfair discrimination**

    Conclusion of the Commissioner of Insurance that a 10% increase in automobile insurance rates for insureds ceded to the Reinsurance Facility

above the rates for voluntary business would be unfairly discriminatory was supported by the Commissioner's findings based on material and substantial evidence that there are no objective criteria for ceding risks to the Reinsurance Facility and that 62.3% of the insureds ceded to the Facility have no assessed SDIP points and have caused no claim payment to be made.

7. **Insurance § 79.3— automobile insurance rates—territorial differences—findings not supported by evidence**

    Findings by the Commissioner of Insurance that projections of territorial rate differences for automobile insurance did not consider the new classification plan required by G.S. 58-30.4 and that the alleged failure to take into account the new classification plan resulted in excessive proposed rates were unsupported by the evidence.

8. **Insurance § 79.3— automobile collision rates— $25 deductible—finding of excessiveness not supported by evidence**

    Determination by the Commissioner of Insurance that the rate proposed for $25 deductible automobile collision insurance was excessive in relation to the coverage provided was not supported by the evidence.

9. **Insurance § 79.1— automobile insurance rate hearing—appeal—order allowing amendment of filing as nullity**

    Where the Rate Bureau appealed from an order of the Commissioner of Insurance in an automobile insurance rate case, the appeal removed the matter from the Commissioner, and a portion of his order allowing the Rate Bureau 60 days in which to amend its filing consistent with his findings and conclusions became a nullity.

    Judge CLARK dissenting.

APPEAL by the North Carolina Rate Bureau and insurance companies from Commissioner of Insurance. Order issued 27 February 1978. Heard in the Court of Appeals 28 March 1979.

On 29 November 1977 the North Carolina Rate Bureau (Bureau) filed with the Commissioner of Insurance its proposed revised premium rates for automobile insurance, including bodily injury and property damage liability, medical payments, and physical damage insurance for non-fleet private passenger automobiles. The Bureau indicated that its calculations indicated the need for a statewide average increase of 23.2%, but in accordance with the requirements of G.S. 58-124.26 it had limited the proposed overall increase to 6%. The filing also proposed that rates for risks ceded to the North Carolina Reinsurance Facility be 10% higher than rates for risks voluntarily retained, and that a ± 5% territorial rate difference be established.

The Commissioner gave notice of public hearing, contending that the filing failed to comply with statutory requirements in a

number of respects. After the hearing the Commissioner made findings of fact and conclusions of law and disapproved the filing. In his disapproval order he also allowed the Bureau sixty days to submit an amended filing consistent with his findings and conclusions, and ordered that the Bureau by its amended filing submit the exact data and information he had requested in the Notice of Public Hearing. From the Commissioner's disapproval order the Bureau appeals.

*Attorney General Edmisten, by Assistant Attorney General Isham B. Hudson, Jr., for the State.*

*Young, Moore, Henderson & Alvis, by Charles H. Young and R. Michael Strickland, for appellants.*

ARNOLD, Judge.

We note with disapproval that counsel for the Bureau has failed to comply with the requirements of App. R. 10(b)(1): "Each exception shall be set out immediately following the record of judicial action to which it is addressed." App. R. 10(a) makes clear that exceptions not so set out in the record cannot be made the bases of assignments of error. The necessity for this rule is most obvious in cases such as the one before us, which involves a 442-page record. It is an unnecessary waste of judicial time, and a source of possibly ineffective review, to require this Court to guess at the parts of the record to which the appellant objects.

Nevertheless, in view of the impact of the insurance rate-making process upon the citizens of the State, we have in our discretion considered this appeal on its merits.

### Commissioner complied with requirements of G.S. 58-124.21(a)

[1, 2]   The Bureau argues that the Commissioner failed to comply with the statutory requirement that in his order disapproving a filing he indicate "wherein and to what extent such filing is deemed to be improper." G.S. 58-124.21(a). We disagree. The Commissioner in his order set out 99 findings of fact and 32 conclusions of law, detailing the improprieties he found in the filing, and we find that these are sufficient compliance with the statute. Nor do we find merit in the Bureau's argument that the enactment of G.S.

58-124.21 has transferred the burden of proof to the Commissioner. There is no burden upon the Commissioner to disprove the filing. The burden upon him is that of being certain that material and substantial evidence exists in the record to support his findings.

G.S. 58-124.21(a) provides in part that when a filing is made "the Commissioner may give written notice to the Bureau specifying in what respect and to what extent he contends such filing fails to comply" with the law. As correctly contended by the Bureau, the purpose of this provision is to provide the Bureau a reasonable opportunity to prepare and offer evidence, and to prevent surprise at the hearing.

[3] In his notice of hearing the Commissioner set forth several items, but he did not disclose that he intended to challenge the data as unreliable because it was unaudited. For this reason, the Bureau argues, the Commissioner failed to comply with the statute, and his findings and conclusions concerning the unreliability of data should be set aside.

The filing does not indicate whether the data had been audited. Assuming the Commissioner knew that the data would be unaudited, fairness in the rate-making process would require him to disclose his objections and intention to challenge the data. This Court, however, cannot assume that which is not supported by the record. Nowhere in the filing does it appear that the data was unaudited. The Commissioner complied with the requirements of G.S. 58-124.21(a).

> Material and substantial evidence supports the
> Commissioner's holding that data is unreliable.

[4] The Commissioner found as fact that none of the underlying loss or expense experience upon which the filing was based had been audited; that in past unaudited filings, errors had later been found; that the accuracy of projections, here, rate level changes, depends upon the accuracy of the underlying data; and that unaudited data are not reliable as a basis for making projections. The Bureau argues that the Commissioner erred in holding the data unreliable.

The standard for review of the Commissioner's decisions is set out in G.S. 58-9.6(b). If the "substantial rights" of the ap-

pellants have been prejudiced, this Court may reverse or modify the Commissioner's "findings, inferences, conclusions or decisions" where they are "[u]nsupported by material and substantial evidence in view of the entire record as submitted." G.S. 58-9.6(b)(5). "Substantial evidence has been described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State ex rel. Comr. of Insurance v. Automobile Rate Office*, 287 N.C. 192, 205, 214 S.E. 2d 98, 106 (1975).

The record contains the testimony of Byron Tatum, Director of Technical Operations for the North Carolina Department of Insurance. Tatum is a certified public accountant, responsible for the audits, examinations and admissions of insurance companies in North Carolina; he qualified at the hearing as an expert in accounting and financial reporting. Tatum testified in pertinent part:

"[A]n audit is an examination not only of the document but the source data from which the document was prepared. . . . The idea is if you do enough of these things . . . you can then say . . . this report is properly prepared and properly . . . shows what it is supposed to show.

. . . .

Q. In your opinion are unaudited reports accurate and reliable?

A. No, ma'am. Unaudited reports cannot be relied upon.

Q. All right, in your opinion, then, would an unaudited statement or report be an appropriate basis on which to base future projections?

A. No, ma'am.

Q. Why?

A. Well, it gets back to the same old basis of, has it been examined. In . . . my experience with Price-Waterhouse making projections, we were never allowed to make projections on unaudited financial statements. . . . The purpose of an audit is to add the credibility to the figures that they lack when they are prepared by management or company accountants.

Also appearing in the record is the testimony of George Gallant, an employee of Insurance Services Office (ISO), which collects insurance statistics from member companies and summarizes the information for the Bureau.

Q. . . . . [D]oes ISO send auditors into any of these companies that report data to it to check their figures?

A. We do not have . . . an auditing team . . . to go out to a company, no, we do not. I think we are relying on your Insurance Department examiners . . . .

. . . .

Q. All right, you said . . . when this data comes in that it is edited?

A. Yes.

Q. Would you please explain to me the difference between editing and auditing data?

A. I would be hard put to describe it. . . . [E]diting . . . is reviewing the data for reasonableness, say, accuracy of codes. . . .

Mr. Robert Brooks, an employee of the National Association of Independent Insurers (NAII), which also collects and summarizes insurance statistics, testified:

. . . As each individual report is received it is logged in and entered into the computer. The . . . part that we would consider edit is that which is checked by the computer, which is to prepare totals and make sure the records are readable, verify the territory . . . and . . . numerical codes. From that is . . . prepared audit lists that individual auditors go over looking for reasonableness between classes, distribution of data and the average rates. . . .

NAII has approximately thirty people in the audit division. They are not mostly CPA's. They are basically people that we have trained . . . to review this information so that you can determine whether the material is logical and reasonable.

. . . .

Q. All right, this auditing that's done, is that an in-house audit?

A. It's an in-house audit, right.

Q. Are there any audits done where they go out?

A. No, we do not go back and re-examine our individual companies.

. . . .

The auditors check to see if the data is reasonable. . . . For instance, we determine whether or not data is reasonable by comparing the company's report for this year with its report for last year.

Q. Let me ask you . . . what do these auditors check when you said they check to make sure it's reasonable?

A. . . . [A]re all the territories there, are all the classes there, does each class have losses, do you have paid and outstanding losses, do the losses have claim counts. In other words, it's the things that make a complete historical picture. . . .

. . . .

. . . [W]hen the picture diverges from what you would normally expect, you begin to ask questions, is this reasonable and you ask the company is this correct.

Paul Mize, General Manager of the Bureau, testified that when the Rate Bureau receives the insurance data

the exhibits are checked against . . . the companies' annual statements and . . . similar data that the companies filed for a previous year and [the Bureau] review[s] the reports for reasonableness.

With respect to in-house audit procedures . . . , each company's report is checked as to the relationships contained therein. For example, the premium tax, taxes license and fees item is checked against written premium. The relationship is checked for reasonableness because we know within what range this figure ought to be.

Q. Would you describe for me what onsite auditing procedures the Rate Bureau . . . carries out, or what independent auditors they have hired to visit these companies and check their files?

A. None. We do not go to a company's office and make an audit of the expense experience.

. . . .

Q. . . . [T]he in-house auditing, is that audit made of only the information that is furnished to the Rate Bureau by the companies, or would they request . . . the original records kept by the company?

A. No. We have not asked for original records from any company. They are checked for reasonableness.

. . . .

. . . We have two auditors and two clerical persons in the audit staff. Neither of these auditors are [sic] certified public accountants. . . . I do not believe that they have any work experience in auditing. . . .

Considering this evidence as a whole, we find that there was material and substantial evidence before the Commissioner to support his conclusion that unaudited data is not a credible basis for justifying a proposed rate-change. It is uncontradicted that no audits, that is, examinations of source data for comparison to the reports filed, were made. Edits and in-house audits were made, but these checked only for reasonableness, not for accuracy of the data. The testimony of the witness Tatum, who qualified as an expert witness, was that unaudited reports are not considered by the accounting profession to be accurate and reliable, and that such reports are not an appropriate basis for projections. Though the Bureau considers this to be "conclusory opinion testimony," expert testimony is competent evidence, upon which the Commissioner may rely. *See State ex rel. Comr. of Insurance v. Automobile Rate Office*, 287 N.C. 192, 214 S.E. 2d 98 (1975). Moreover, we cannot say that opinion evidence does not constitute material and substantial evidence.

Not only was Tatum's testimony uncontradicted, he was not even cross-examined with respect to his opinion testimony concerning unaudited data. Nor does the record contain any evidence

that in fact an audit such as Tatum described, utilizing statistical sampling techniques, would be prohibitive from the standpoints of time or cost.

## Commissioner's order to use "capital asset pricing model" is error.

[5]   William Fairley qualified as an expert in economics and statistics, and testified as to the proper method of calculating appropriate rates of return in the insurance industry. His theory, in essence, requires that a "target rate of return" to the insurance companies be established. This is done by considering the "systematic risk" in the industry, that is, the degree to which the variability in return on an investment in that industry moves with the stock market, and adding the necessary "reward" to encourage investors to hold those securities. (For example, a stock that went down twenty percent when the market went down ten would have a high systematic risk, and would require a higher reward.) This target rate of return is then used to calculate the appropriate underwriting profit as follows:

| Target Return = | Underwriting Profit | + Investment Return on Cash Flow | + Investment Return on Capital |

or

| Underwriting Profit | = Target Return | − Investment Return on Cash Flow | − Investment Return on Capital |

The Commissioner ordered that this "capital asset pricing model" be used to calculate underwriting profit margins.

The Bureau finds this theory unacceptable partly because it requires the consideration of investment earnings on invested capital in determining appropriate premiums. However, this Court has recently decided that investment income may be considered in evaluating the reasonableness of a filing. *State ex rel. Comr. of Ins. v. N. C. Rate Bureau*, 40 N.C. App. 85, 252 S.E. 2d 811 (1979). It is thus proper for the Commissioner to consider investment earnings on capital invested by insurers in reviewing the rate making formula.

The Bureau further attacks the Commissioner's conclusion that the investment income that should be considered is not actual investment income, but the hypothetical income that could be obtained on risk-free investments, which the Commissioner specifies as U. S. Treasury securities. This Court has determined that such a requirement would be contrary to the intent of the legislature as evidenced by G.S. 58-79.1, which sets out a variety of investments in which insurance companies other than life insurance companies may engage. Therefore, based on our decision in *State ex rel. Comr. of Ins. v. N. C. Rate Bureau, id.,* use of the "capital asset pricing model" as ordered by the Commissioner is foreclosed, and that part of the Commissioner's order is reversed.

> Material and substantial evidence supports
> Commissioner's disapproval of higher rates
> for facility risks.

[6] The Commissioner found as fact:

86. That the filing proposes a rate differential of 10% between Voluntary Business and Ceded Business. . . .

87. That the filing does not propose any fixed set of objective criteria for deciding which risks may be ceded to the Reinsurance Facility, and that in the absence of such criteria the decision to cede a given risk is based entirely on the subjective judgment of the individual insurer.

88. That as of June 30, 1976, there were a total of 2,733,003 exposures being underwritten for private passenger automobile liability coverage in North Carolina, and that of these 2,733,003 exposures, 547,752, representing 20.0% of the total, were ceded to the Facility.

89. That of the 547,752 ceded exposures, 475,704, representing 86.9% of the total cessions, had not caused a liability claim payment to be made by their insurer.

90. That of the 547,752 ceded exposures, 389,111, representing 71.0% of the total cessions, had not been assessed any SDIP points.

91. That of the 547,752 ceded exposures, 341,273, representing 62.3% of the total cessions, were exposures

which had not been assessed any SDIP points and which also had not caused a liability claim payment to be made by their insurer.

92. That the cost to the insurer of acquiring and servicing a risk which is subsequently ceded to the Facility is not greater than the same costs with respect to a risk voluntarily retained, but because all such costs are charged and accounted for as a percentage of premium, ceded insureds paying a premium based on a 10% higher Facility rate would pay a higher dollar amount for acquisition and service cost, than would an insured who is not ceded.

and concluded

22. That in view of the current composition of the Facility, a 10% increase in the Facility Rate above the rates for voluntary business would be excessive and unfairly discriminatory.

23. That because acquisition and service costs are charged and accounted for as a percentage of premium, a Facility rate 10% higher than the proposed rates for insureds voluntarily retained will result in ceded risks paying disproportionately higher acquisition and service costs, and that the higher Facility rate is therefore excessive and unfairly discriminatory.

The Commissioner's Finding of Fact No. 87, "[t]hat the filing does not propose any fixed set of objective criteria for deciding which risks may be ceded to the Reinsurance Facility" cannot alone support his conclusion, since G.S. 58-248.35 provides: "Upon receipt by the company of a risk which it *does not elect* to retain, the company shall follow such procedures for ceding the risk as are established by the plan of operation." G.S. 58-248.35 (emphasis added).

We find, however, that there appears in the record material and substantial evidence to support the Commissioner's findings of fact. The figures and percentages he found are drawn directly from the Bureau's Exhibit #RB33. And based upon the finding that there are no objective criteria for cession to the Facility, and the Commissioner's finding that 62.3% of the insureds ceded to the Facility have neither assessed any SDIP points nor caused a

claim payment to be made, we find that there is ample support for the Commissioner's conclusion that a 10% rate increase for insureds in the Facility would be unfairly discriminatory.

> Findings that projections of territorial rate
> differences did not consider new classifica-
> tion plan, and that the alleged failure to
> consider new classification plan resulted in
> excessive rates are not supported.

[7]  The Bureau in its filing proposed that future premium rates vary within a range of ±5% according to the "territory," or geographical area of the state, in which an insured is located. The Commissioner found that the projections of territorial rate differences did not take into consideration the new statutory classification plan and so did not reflect reasonably anticipated territorial loss experience. He concluded that this made the proposed rate changes excessive and unfairly discriminatory. He also concluded:

25. That the establishment of rate differentials for a system of geographic territories under which an insured is assigned to a particular territory on the basis of where his vehicle is principally garaged rather than where the vehicle is principally driven would result in rates which are unfairly discriminatory.

26. That the establishment of rate differentials for a system of geographic territories under which chargeable accidents are attributed to the territory in which the vehicle is principally garaged rather than to the territory in which the accident actually occurred would result in rates which are unfairly discriminatory.

27. That the establishment of rate differentials for a system of geographic territories which was established 20 years ago and has not been revised to reflect shifts in population distribution and traffic flow patterns would result in rates that are unfairly discriminatory.

28. That the establishment of rate differentials for a system of geographic territories under which insured[s] in higher-rated territories would be compelled to pay disproportionately high acquisition and service costs while insureds in

lower-rated territories pay disproportionately low acquisition and service costs when the actual costs for acquisition and service are substantially the same for both groups would result in rates which are unfairly discriminatory.

29. That the establishment of rate differentials for a system of territories under which inner city residents are compelled to pay rates which reflect hazards created in significant part by commuters whose vehicles are garaged in other territories and are not subject to the same rate would result in rates which are unfairly discriminatory.

30. That the establishment of rate differentials for a system of geographic territories under which insureds living on the periphery of urban centers but who drive mainly outside inner city areas are nevertheless compelled to pay higher inner city rates would result in rates which are unfairly discriminatory.

The record is bare of evidence to support Conclusions 25 through 30. The minimal evidence that appears on those points supports the Bureau's position. Therefore these conclusions may not stand. The Commissioner's disapproval must be based on an affirmative showing that the proposed filing fails to comply with statutory standards. *State ex rel. Comr. of Ins. v. Rating Bureau,* 30 N.C. App. 487, 228 S.E. 2d 261 (1976), *aff'd* 292 N.C. 70, 231 S.E. 2d 882 (1977). And while it is the duty of the Commissioner to determine the credibility of evidence, he may not reject as untrustworthy, *for no apparent reason,* uncontradicted testimony or data submitted through competent and unimpeached witnesses. *State ex rel. Comr. of Ins. v. Rating Bureau,* 292 N.C. 471, 234 S.E. 2d 720 (1977).

The new classification plan required by G.S. 58-30.4 was intended to put into effect G.S. 58-30.3, ending classifications based on age or sex. By the terms of G.S. 58-124.19(4) the plan was to be implemented no later than 1 December 1977. The Bureau argues that because the instant filing was made on 29 November 1977, it was not necessary for the proposed rates to take into account the effect of the new classification plan. It is not necessary for us to decide this question, however, since the uncontradicted testimony of the witness Boison shows that the new classification plan was, to the extent possible, taken into account in this rate filing. And

the Bureau's Exhibit #RB29, Exhibit 6, Part V, sets out by territory the anticipated percentage effect of the new classification plan. We find merit in the Bureau's argument that it could be no more precise, since no experience data had yet been generated under the new classification plan.

In addition, we find no support in the record for the Commissioner's conclusion that the Bureau's alleged failure to take into account the new classification plan resulted in *excessive* proposed rates. The only testimony on this point was that of Boison, who testified that the effect on rates, though negligible, was slightly negative overall.

No evidence to support Commissioner's
disapproval of deductible collision rates
as being excessive.

[8]  The Commissioner found as fact:

67. That the proposed filing establishes certain new collision deductibles and collision comprehensive deductible relativities.

68. That the filing proposes collision insurance premiums for an average automobile as follows:

| Deductible | High rated Territory | Low rated Territory |
|------------|----------------------|---------------------|
| $ 25 | $174 | $161 |
| $ 50 | $116 | $107 |
| $100 | $ 92 | $ 84 |
| $500 | $ 51 | $ 46 |

69. That in the proposed high rated territories, the proposed premium for $25 deductible collision is 150% of the premium for $50 deductible collision and 189% of the premium for $100 deductible collision.

70. That in the proposed low rated territories, the proposed premium for $25 deductible collision is 150% of the premium for $50 deductible collision and 192% of the premium for $100 deductible collision.

and concluded that the rate proposed for $25 deductible collision is excessive in relation to the coverage provided. There is no

evidence in the record to support this conclusion. Leroy Boison testified that the relativities are based upon experience, and that the deductibles are in fact a cost saving device for the insured, allowing him to pay a lower premium by retaining a portion of the loss himself. For lack of an evidentiary basis, the Commissioner's conclusion must fail.

Appeal by Bureau nullifies Commissioner's
Order to submit amended filing.

[9]    In his order disapproving the filing the Commissioner further ordered that the Bureau be allowed sixty days within which to file an amended filing consistent with his findings and conclusions. Inasmuch as the Bureau excepted and appealed from the Commissioner's order, the appeal removed the matter from the Commissioner to this Court, and that part of the Commissioner's order became a nullity.

Summary

In summary, that part of the Commissioner's order disapproving higher rates for voluntary and facility risks is affirmed. Accordingly, pursuant to G.S. 58-124.22(b) the escrowed premiums collected in excess of the rates in effect as of the filing (29 November 1977) must be refunded. However, that part of the order disapproving the proposed rates for $25 deductible collision coverage is reversed, and it is ordered that the proportionate escrowed funds representing this proposed rate increase shall be remitted to the member insurers pursuant to G.S. 58-124.22(b). In addition, other portions of the Commissioner's order were also in error as previously discussed. Thus, the order of the Commissioner is

Affirmed in part and reversed in part.

Chief Judge MORRIS concurs.

Judge CLARK dissents.

Judge CLARK dissenting.

The 29 November 1977 filing on its face supports a statewide average increase of 23.2%. G.S. 58-124.26 places a cap on

automobile insurance rate increases, limiting the increase to not "more than twelve percent (12%) from the general rate level existing at the time of the ratification of this Article, provided that such increase shall not exceed six percent (6%) on or prior to July 1, 1978." The result of the majority opinion is that any opportunity for increase, except for the proposed rate for $25 deductible collision coverage, for the period up to July 1, 1978, is lost to the member insurers of the Rating Bureau. The opinion has based its affirmance of the Commissioner's disapproval order on, first, the failure of the Bureau to submit audited data, and, second, the fact that a 10% higher Facility rate is excessive and unfairly discriminatory.

It is my opinion that the Commissioner has waived the requirement that the data be audited. There should be no fair dispute over the right of the Rating Bureau to know the nature of the evidence on which the Commissioner relies. Due process in the rate-making procedure is provided for in G.S. 58-124.21, as follows: "At any time within 30 days from and after the date of any filing, the Commissioner *may* give written notice to the Bureau specifying in what respect and to what extent he contends such filing fails to comply with the requirements of this Article and fixing a date for hearing. . . ." (Emphasis added.) I interpret the statute to mean that if the Commissioner is not fully satisfied with the filing and its supporting data he *may* give notice of a hearing, and that the hearing will be confined to those matters specified in the notice of hearing. An interpretation that the Commissioner *may* specify "in what respect and to what extent he contends such filing fails to comply" would give him the option of giving notice of hearing without restrictions and without notice to the Rate Bureau as to those matters in the filing which he contends fail to comply with the law. Such an interpretation would obviously violate legislative intent and due procedure.

In his notice of hearing to the Bureau the Commissioner did not specify that the filing did not comply because the data filed to support the filing was unaudited. It is clear that at the time the notice was given the Commissioner had knowledge that the data was unaudited. An audit involves formal examinations and authentication of records, and includes a final report or certification of the audit. There was nothing in the filing to indicate that

that data was audited. The following appears in the Commissioner's appeal brief:

"Finally, the appellants contend that the Commissioner's conclusions should be rejected because the 'Notice of Hearing' fails to disclose even a hint that the data would be challenged. With respect to this contention, it is enough to say that the filing did not indicate that the data to be presented had not been audited. While it is true that past rate filings by various statutory rate bureaus did not employ audited data, these filings were made under other governing statutes and regulations. Neither the Bureau nor the Commissioner should be bound by past practices. . . ."

It is my opinion that though the Commissioner and the Bureau should not be bound by past practices, if the Commissioner wants a material change in the nature of the evidence on which he relies, then due process requires that the Bureau be given notice and an oppotunity to comply or to show cause why it could not do so.

Nor do I agree with that part of the majority opinion relating higher rates for Facility risks, which concludes:

. "And based upon the finding that there are no objective criteria for cession to the Facility, and the Commissioner's finding that 62.3% of the insureds ceded to the Facility have neither assessed any SDIP points nor caused a claim payment to be made, we find that there is ample support for the Commissioner's conclusion that a 10% rate increase for insureds in the Facility would be unfairly discriminatory."

I question this conclusion. Under the statute the insurer may elect to cede to the Facility, and it appears to me that the data presented establishes that rate differentials between "clean risks" and voluntary risks are sound. Rate Bureau Exhibit 19 shows a claim frequency per hundred cars for "clean risks" is about double that of the voluntary risks. Further, this seems of little importance since the data supports an 11.8% increase for voluntary business and 63.4% increase for insureds in the Facility. Any insurance rate will discriminate against some insureds;

the question is whether there is unfair discrimination. I do not think that the Commissioner's conclusion is supported by the evidence.

Finally, assuming the majority opinion is correct in its conclusion relating to unaudited data and the increased rate for Facility risks, it is my opinion that the Bureau should be given a rehearing and allowed to present new evidence limited to these two questions or to show cause why the Bureau was unable to do so.