STATE OF NORTH CAROLINA, EX REL. COMMISSIONER OF INSURANCE v.
NORTH CAROLINA RATE BUREAU, LIBERTY MUTUAL FIRE IN-
SURANCE COMPANY, LIBERTY MUTUAL INSURANCE COMPANY,
AETNA CASUALTY & SURETY COMPANY, AMERICAN MUTUAL
LIABILITY INSURANCE COMPANY, STANDARD FIRE INSURANCE
COMPANY, TRAVELERS INSURANCE COMPANY, LUMBERMENS
MUTUAL CASUALTY COMPANY, UNITED STATES FIDELITY &
GUARANTY COMPANY, AMERICAN MOTORISTS INSURANCE COM-
PANY, FIDELITY & GUARANTY INSURANCE UNDERWRITERS,
TRAVELERS INDEMNITY COMPANY, MARYLAND CASUALTY COM-
PANY, TRAVELERS INDEMNITY COMPANY OF RHODE ISLAND,
PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COM-
PANY

IN THE MATTER OF A FILING DATED OCTOBER 12, 1978 BY THE
NORTH CAROLINA RATE BUREAU FOR REVISED WORKERS' COM-
PENSATION INSURANCE RATES DOCKET NO. 288

No. 7910INS338

(Filed 18 December 1979)

1. **Master and Servant § 80— workers' compensation insurance rates—duty to promulgate**

    The Commissioner of Insurance does not have the affirmative power to promulgate rates for workers' compensation insurance, since this duty has been explicitly granted by the General Assembly to the N. C. Rate Bureau. However, the Rate Bureau has the burden of showing that its proposed rates are fair and reasonable.

2. **Master and Servant § 80— rejection of filing by Commissioner of Insurance —showing required**

    The Commissioner of Insurance has the burden of affirmatively and specifically showing, by material and substantial evidence, how the Rate Bureau has not carried its burden should the Commissioner reject the proposed filing.

3. **Master and Servant § 80— workers' compensation insurance rates—unreliability of unaudited data—insufficient evidence to support finding**

    A finding by the Commissioner of Insurance that unaudited statistical data furnished by the N. C. Rate Bureau was not reliable for workers' compensation insurance rate-making purposes was not supported by substantial evidence where the witness presented by the Department of Insurance, a C.P.A., admitted that a C.P.A. was not trained to evaluate loss experience data, and the uncontroverted testimony of an expert witness presented by the Rate Bureau showed in great detail how the statistical "editing" used by the National Council on Compensation Insurance in preparing the data used in the filing would detect source data errors and how, even if a source data error were undetected, the processing, including averaging and weighting, of the source data with time series data, calendar year data, policy year data, and in some

instances countrywide data, would negate any material effect of such error and would nonetheless lead to a fair calculation of reasonable rates.

**4. Master and Servant § 80— workers' compensation insurance rates—requirement that data be audited—arbitrary and capricious action**

The action of the Commissioner of Insurance in requiring audited data in a workers' compensation rate case was arbitrary and capricious, violated principles of due process and contravened the spirit if not the letter of the Administrative Procedure Act where (1) the Commissioner's initial disapproval notice directing the Rate Bureau to show that the filing was based on audited data was based on orders in two prior rate cases which were not binding on the Rate Bureau and constituted improper rule making; (2) the Commissioner's order was unreasonably vague in failing to indicate whether both national and state data should be audited, whether a complete audit rather than a statistical audit was required, how far back the audit must go, what statistical techniques and what sample sizes and various factors were to be used, and whether actuaries or accountants or both must conduct the audit; and (3) the order imposed an unreasonable burden upon the Rate Bureau to have to audit all the back records from workers' compensation companies in the nation over an unspecified period of time, particularly since no hearing was held in which the extent of this burden and the time and cost considerations were aired.

**5. Master and Servant § 80— workers' compensation insurance rates—investment income on invested capital**

The Commissioner of Insurance erred in requiring that investment income on invested capital be included in the rate-making formula for workers' compensation insurance rates.

**6. Master and Servant § 80— workers' compensation insurance rates—federal wage and price guidelines**

The Commissioner of Insurance erred in finding that a proposed increase in workers' compensation insurance rates violated federal wage and price guidelines since the guidelines were not promulgated until two weeks after the rate filing became effective and were only voluntary.

**7. Master and Servant § 80— workers' compensation rate filing—inclusion of previous rate increase**

A finding by the Commissioner of Insurance that a workers' compensation rate filing did not take into account a previous rate increase was unsupported by the evidence.

Judge ERWIN concurring.

Judge ARNOLD concurring in part and dissenting in part.

Chief Judge MORRIS concurring for purpose of clarifying holding on investment income on invested capital in *Comr. of Insurance v. Rate Bureau*, 41 N.C. App. 310.

APPEAL by the North Carolina Rate Bureau and member companies from Order of the Commissioner of Insurance issued 9 January 1979. Heard in the Court of Appeals 28 November 1979.

On 12 October 1978 the North Carolina Rate Bureau (hereinafter referred to as the "Bureau") pursuant to Article 12B of Chapter 58 of the General Statutes of North Carolina, filed with the Commissioner of Insurance a revised Workers' Compensation Rate Plan (hereinafter referred to as the "Filing"). The Filing proposed an increase of 19.8 percent in the overall level of workers' compensation insurance rates based upon changes in the benefit levels as well as increases in payout experience and trend factors.

On 14 November 1978 the Commissioner issued his disapproval notice and order contending that the Filing failed to comply with Chapter 58 of the General Statutes because: (1) the Filing contained no breakdown of incurred losses into paid losses, loss reserves, bulk reserves, and incurred but not reported losses; (2) the Filing did not take into account income from the investment of unearned premium reserves and loss reserves; (3) the Filing did not indicate whether the loss experience data was audited, as required by Orders of the Commissioner on 7 December 1977 and 27 February 1978; (4) the proposed rates were excessive due to basing of expense allowance solely on the experience of stock companies; and (5) countrywide expense and loss experience and other countrywide data were considered when credible North Carolina experience or data was available.

On 1 December 1978 the Bureau moved to vacate those portions of the disapproval order of 14 November 1978 which pertained to income from the investment of unearned premium reserves and loss reserves, and which pertained to auditing of loss experience data.

A hearing before the Commissioner of Insurance was held on 5 December 1978. The Bureau proffered the testimony of Roy Kallop. Kallop's qualifications as an expert included a bachelor's degree from Columbia College and a master's degree in mathematics at New York University. Kallop testified that he had been employed as an actuary with the National Council on Compensation Insurance since 1948, that he had participated in many filings and hearings pertaining to workers' compensation rates, that he was a Fellow of the Casualty Actuarial Society and had served on the Board of Directors of that organization, that he was a member of the American Academy of Actuaries and the International Actuarial Association, and that in the mid-1970's he

published a paper for the Casualty Actuarial Society on workers' compensation rate-making.

Kallop also explained that the National Council on compensation insurance was organized in 1922 under the sponsorship of the National Convention of Insurance Commissioners at a time when there was a series of separate state-by-state bureaus which proved to be an inefficient way of developing rates. Today the National Council's basic responsibility is to compute statistics, summarize them and prepare filings on behalf of the Council's members and subscribers. The Council is the official rate-making' organization in about thirty states. For over thirty years the Council has assisted the North Carolina Rate Bureau and its predecessors in the compilation of statistics and exhibits in connection with rate filings subject to the Bureau's direction.

The North Carolina Department of Insurance (the "Department") presented the testimony of Byrum Tatum, Director of Technical Operations for the Department. Mr. Tatum had been a certified public accountant for seven years and prior to coming with the Insurance Department he had been a partner in a public accounting firm in Asheville, North Carolina. In addition, the Department presented a transcript of prior testimony of Dr. William B. Fairley. Dr. Fairley is an economist and statistician employed by the State Rating Bureau of the Division of Insurance of the Commonwealth of Massachusetts.

On 9 January 1979 the Commissioner issued an Order which disapproved the Filing in its entirety and allowed sixty days for the Bureau to submit an amended filing consistent with the Commissioner's Order. The Bureau now appeals from this Order.

*Attorney General Rufus Edmisten by Assistant Attorney General Isham B. Hudson, Jr., for the State.*

*Young, Moore, Henderson & Alvis by Charles H. Young and George M. Teague for appellants.*

CLARK, Judge.

Over the last seven years marking the tenure of the present Commissioner of Insurance, the Appellate Division has been beset with the burden of reviewing the Commissioner's disapproval of virtually every Filing which has proposed an increase in insurance rates. Almost invariably (in at least eighteen cases to

Comr. of Insurance v. Rate Bureau

date) the Appellate Division has found the orders and rulings of the Commissioner to be unacceptable in whole or in part under the law of this State.* For several years the rate-making process was stalemated by a seemingly endless cycle in which the Commissioner would disapprove a rate filing, the Appellate Division would find no legal basis for the Commissioner's disapproval, and upon remand the Commissioner would find another ground for disapproving a proposed rate increase. In 1977 the General Assembly enacted major structural amendments to the insurance rate-making statutes in an apparent attempt to eliminate this regulatory impasse. In this regard, *see State ex rel. Commissioner of Insurance v. Rate Bureau,* 40 N.C. App. 85, 252 S.E. 2d 811, *cert. denied,* 297 N.C. 452, 256 S.E. 2d 810 (1979), as well as the comment of former Justice Lake in *Commissioner of Insurance v. N. C. Fire Insurance Rating Bureau,* 292 N.C. 471, 490, 234 S.E. 2d 720 (1977). It is not for this Court to impugn the motives of the Commissioner, *id.;* nor do we sit as a legislature with the responsibility of drafting insurance legislation; rather our duty is to interpret the insurance law as given to us by the General Assembly and to see that the law is properly enforced. We can only note, as the public record of a long series of cases before the Appellate Division shows, that the Commissioner, with undesirable frequency, over an extended period of time, has failed to effectively administer the insurance rate-making statutes in conformity with the purposes and standards prescribed by the General Assembly.

There seems to be no abatement of this trend, even after the 1977 amendments. The instant case presents the fifth appeal this year from disapproval orders of the Commissioner. *See also, State*

* In the following cases decided between 1973 and 1978 the Appellate Courts have reversed, modified or vacated the Commissioner's order in whole or in part. *State ex rel. Commissioner of Insurance v. Automobile Rate Office,* 19 N.C. App. 548, 199 S.E. 2d 479, *cert. denied,* 284 N.C. 424, 200 S.E. 2d 663 (1973); *Commissioner of Insurance v. Automobile Rate Office,* 24 N.C. App. 228, 210 S.E. 2d 439 (1974), *affirmed, cause remanded,* 287 N.C. 192, 214 S.E. 2d 98 (1975), *appeal after remand,* 30 N.C. App. 427, 227 S.E. 2d 603 (1976), *modified, cause remanded,* 292 N.C. 1, 231 S.E. 2d 867 (1977); *State ex rel. Commissioner of Insurance v. Auto Rate Office,* 24 N.C. App. 223, 210 S.E. 2d 441 (1974), *cert. denied,* 286 N.C. 412, 211 S.E. 2d 801 (1975), *appeal after remand,* 30 N.C. App. 477, 227 S.E. 2d 621 (1976); *State ex rel. Commissioner of Insurance v. Automobile Rate Office,* 23 N.C. App. 475, 209 S.E. 2d 411 (1974), *cert. denied,* 286 N.C. 412, 211 S.E. 2d 219 (1975); *State ex rel. Commissioner of Insurance v. Integon Life Insurance Company,* 28 N.C. App. 7, 220 S.E. 2d 409 (1975); *State ex rel. Commissioner of Insurance v. Compensation Rating and Inspection Bureau,* 28 N.C. App. 409, 221 S.E. 2d 96 (1976); *State ex rel. Commissioner of Insurance v. Automobile Rate Office,* 29 N.C. App. 182, 223 S.E. 2d 512 (1976); *State ex rel. Commissioner of Insurance v. Fire Insurance Rating Bureau,* 291 N.C. 55, 229 S.E. 2d 268 (1976); *State ex rel. Commissioner of Insurance v. Fire Insurance Rating Bureau,* 292 N.C. 70, 231 S.E. 2d 882 (1977); *Foremost Insurance Company v. Ingram,* 292 N.C. 244, 232 S.E. 2d 414 (1977); *Commissioner of Insurance v. Rating Bureau,* 292 N.C. 471, 234 S.E. 2d 720 (1977); *Automobile Rate Insurance Office v. Ingram,* 35 N.C. App. 578, 242 S.E. 2d 205 (1978); *State ex rel. Commissioner of Insurance v. Compensation Rating and Inspection Bureau,* 36 N.C. App. 98, 242 S.E. 2d 887 (1978).

*ex rel. Commissioner of Insurance v. Rate Bureau*, 40 N.C. App. 85, *supra; State ex rel. Commissioner of Insurance v. Rate Bureau*, 41 N.C. App. 310, 255 S.E. 2d 557 (1979); *Commissioner of Insurance v. Rate Bureau*, No. 7910INS58 (Filed 20 November 1979); *State ex rel. Commissioner of Insurance v. Rate Bureau*, No. 7910INS202 (Filed 20 November 1979). In each of these cases this Court has held that the Commissioner, in whole or in part, exceeded his power under the new insurance statutes enacted by the General Assembly in 1977, that the Commissioner's Findings of Fact were not supported by substantial evidence in the record or that the Commissioner acted in an arbitrary and capricious manner thereby depriving the regulated insurance companies of due process of law. In the case before us we must again vacate the disapproval order of the Commissioner.

[1]   Simply speaking, the Office of the Commissioner of Insurance does not have the affirmative power to promulgate rates for workers' compensation insurance; rather, this duty has been explicitly granted by the General Assembly to the North Carolina Rate Bureau, G.S. § 58-124.17(3); *State ex rel. Commissioner of Insurance v. Rate Bureau*, No. 7910INS202 (Filed 20 November 1979). The Rate Bureau has the burden of showing that its proposed rates are fair and reasonable, *State ex rel. Commissioner of Insurance v. Rating Bureau*, 292 N.C. 70, 79, 231 S.E. 2d 882 (1977); that is, the carriers must show that under the rate schedule they will "retain a fair and reasonable profit and no more," *State ex rel. Commissioner of Insurance v. Rating Bureau*, 292 N.C. 471, 483, 234 S.E. 2d 720 (1977), and that overall rates are not "excessive, inadequate or unfairly discriminatory." G.S. § 58-124.19.

[2]   Nonetheless, the new statutory scheme places on the Commissioner the burden of affirmatively and specifically showing, by material and substantial evidence, how the Bureau has not carried its burden should the Commissioner reject the proposed filing. G.S. § 54-124.21(a); § 58-9.6(b)(5). *See also, State ex rel. Commissioner of Insurance v. Rating Bureau*, 292 N.C. 70, 231 S.E. 2d 882 (1977); *State ex rel. Commissioner of Insurance v. Rate Bureau*, 40 N.C. App. 85, *supra.* If the Commissioner fails to make this affirmative showing "supported by substantial evidence," the presumption of *prima facie* correctness given to an order of the Commissioner by G.S. § 58-9.4 is rebutted and the filing will re-

main in effect. The standard of "substantial evidence" is not to be lightly regarded; it is more than a scintilla of evidence or a permissible inference; rather, "substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *State ex rel. Commissioner of Insurance v. North Carolina Automobile Rate Administrative Office*, 287 N.C. 192, 214 S.E. 2d 98 (1975).

These administrative standards are the law of this State, and the Commissioner, whatever his objectives may be, and however laudable they may be, must conform with these guidelines or face the continued prospect of having each of his actions nullified or vacated by the appellate courts of this State. We hardly need to mention the inevitable detrimental consequences such ineffective regulatory review would have upon rate payers in North Carolina.

I

[3]   The Bureau's first contention is that the Commissioner erred in finding that the statistical data furnished by the Rate Bureau was not reliable for rate-making purposes. The relevant findings of fact by the Commissioner are set forth as follows:

"23. That the data upon which this filing is based has not been audited by the Bureau, the National Council on Compensation Insurance, the member companies of the Bureau, or independent auditors.

24. That the data has been subjected to an 'edit' performed by a computer and to a review for 'overall reasonableness and accuracy' performed by 'editors' employed by the National Council on Compensation Insurance (NCCI).

25. That an audit will detect errors and omissions that an edit will not detect.

26. That an 'audit' differs from an 'edit' in that an 'audit' requires the examination of sufficient competent evidential matter to ascertain the correctness of the data being utilized while an 'edit' only ascertains conformity to broad parameters of acceptability.

27. That the minimum reasonable audit procedures to be performed by the NCCI are the examination of the reported data by persons with adequate technical training as auditors

utilizing statistical sampling techniques with a sample size which is adequate to ascertain, with specified precision and reliability, the correctness of the data being reported.

28. That the accuracy of projections is dependent upon the accuracy of the underlying data.

29. That unaudited data is not reliable as a basis for making projections.

30. That the indicated rate level changes presented in this filing are projections based on unaudited data and are not reliable."

Similarly, the Commissioner articulated the following conclusions of law relating to the auditing of data.

"1. That due consideration has not been given to past and prospective loss experience within North Carolina.

2. That the proposed rates are excessive due to basing the expense allowance in the rate-making formula solely on the expense experience of stock companies when stock companies have greater expenses than other companies.

3. That countrywide expense and loss experience and other countrywide data was considered when credible North Carolina experience was available.

4. That the accuracy of projections is dependent upon the accuracy of the underlying data.

5. That unaudited data is not reliable as a basis for making projections and that the indicated rate level changes presented in this filing are projections based upon unaudited data and are not reliable.

6. That the Rate Bureau did not exercise due care in the preparation of the filing in that it failed to audit or cause to be audited the underlying data used to make projections of indicated rate level changes.

7. That the proposed rate level changes shown in the filing are excessive or inadequate to the extent that undetected errors in the unaudited data reported by companies would cause an overstatement or understatement thereof."

We do not find substantial evidence in the record to support the Commissioner's conclusion that the unaudited data was unreliable. First, on many occasions the Commissioner, sitting as a quasi-judicial trier of fact, tried to interject into the testimony his experience with alleged mistakes made in other rate filings by other classifications of carriers. First, these conclusory statements are of limited relevance, if any. We note that the Commissioner is bound to regard the rules of evidence applicable to the Trial Division of the General Court of Justice in North Carolina, since the rate-making proceeding is adversary in nature and involves "contested" matters. G.S. § 150A-29 (effective 1973). *Cf. In re Filing by Automobile Rate Office,* 278 N.C. 302, 318, 180 S.E. 2d 155 (1971), interpreting former statute G.S. § 143-317, -318, which included language concerning "legal rights, duties, or privileges," not found in G.S. § 150A-29. Second, the comments of the Commissioner made while cross examining a witness are not only not substantial evidence, they are not evidence at all. G.S. § 150A-29(b). Moreover, no documents were introduced, either by the Department or the Commissioner (however inappropriate it may be for the trier of fact to introduce evidence) to prove any mistakes which may have been detected in prior proceedings, much less to prove any errors in this proceeding. *Id.*

We next come to the testimony of Mr. Tatum, a certified public accountant (C.P.A.) working in the Department of Insurance. Mr. Tatum testified in effect that all unaudited data was unreliable. In an earlier decision, *In re Commissioner of Insurance v. Rate Bureau,* 41 N.C. App. 310, *supra,* a majority panel of this Court found that Mr. Tatum was a qualified expert witness. However, in this case, where one of the Commissioner's primary contentions is that the loss reserve data was unreliable. Mr. Tatum explained that C.P.A.s were not competent to evaluate loss reserve data:

> ". . . What I am saying is that even a certified public account- ant cannot really determine the adequacy of reserves. *A CPA is not trained to determine or evaluate the reserves, he can- not certify the reserves,* it's against the professional ethics to certify the reserves." (Emphasis added.)

Stated differently, Mr. Tatum was not competent to testify that the complex statistical techniques used by the actuaries at the

National Council would not ferret out any material error in the calculation of reasonable rates, or, similarly, that even if an error in the source data were shown, that the error would, after the selective "editing" process used by the National Council, actually affect the end result in a *material* way. Moreover, Mr. Tatum did not present any evidence to show that the data used *in this Filing*, when processed by the techniques used by the National Council, was not reliable and would not produce reasonable rates.

In contrast, the Rate Bureau submitted the testimony of Roy Kallop, whose credentials are far superior to those of Byrum Tatum in matters of insurance statistics. Mr. Kallop testified as to a number of statistical and judgmental checks systematically used by the National Council:

(1) Review of listings of all daily validation runs to check the volume changes and to see if loss emergence is within certain parameters for different types of injuries;

(2) Printout and verifications of losses that exceed $10,000;

(3) Review of the relationship between total payroll and total premiums in any given year to check for aberrations in the data;

(4) Comparison of payrolls for different years for each class of case to observe any unusual changes;

(5) Comparison of computer runs of the distribution of premiums by size;

(6) Summations of unit statistical data by industry group and by classification for verification purpose;

(7) Comparisons of the report data with other statistical documents of the companies, including audited annual statements, "so that if there's any company that is not reserving properly, this would manifest itself as an anomaly in [the] procedures";

(8) Computation, for each industrial classification code, of a credibility factor for state credibility and national credibility, based upon actual experience and volume for each classification;

(9) Auditing of the National Council within the last three years by independent auditors or state insurance departments;

(10) Cross checks of the calendar year and policy year data;

(11) Review of company reportings for 3 years in a row; and

(12) Tracking of a loss development factor over a reporting period throughout a year and over a period of years in order to determine whether reserving has been too high or too low.

In addition, Mr. Kallop explained:

"The calendar year data is reconciled with policy year data. [S]o there is a check made to see that the calendar year reported is consistent with the summation of the policy year components. *The calendar year data is compared with the insurance expense exhibit.* The insurance expense exhibit is a report that is submitted to *each insurance department* by the insurance carrier. It is an exhibit that is affiliated with the annual statement . . . . [*See* G.S. § 58-21] The calendar year data cannot be actually balanced to the insurance expense exhibit in a precise sense, in that the experience that we have in our call excludes experience for the Longshore Act, because it is not part of this filing and coal mine experience, but also excludes U.S. Defense projects, rating plan experience, and coal mine experience, excess policies. *But we can check the two for reasonableness and where there is a difference, we then pursue it* to see if the difference is indeed due to the experience that normally is not included in our call. *So we do have a check for reasonableness. It is possible to detect significant variations between the company data and the insurance expense exhibit. If there is a difference between the two, then it is pursued to see if the difference might be due to an erroneous report* . . . or one of these other types of experience that is not part of our call." (Emphasis supplied.)

After explaining the sophisticated procedure of preparing and calculating data for a rate filing, Mr. Kallop summarized his professional opinion:

"In my opinion, the methods that I have just described for making the various calculations that I have testified to and in producing the overall statewide rate level change as sound and reliable methods for doing so. These are the methods utilized by the National Council nationwide. This methodology is utilized in about forty or more states. In my opinion the methods that I have described in making the various calculations in the calculation of the overall rate level change *are actuarily sound* . . . . In my opinion, the *overall rate level change proposed in this filing is actuarily sound and is fully justified.*" (Emphasis supplied.)

Also, Mr. Kallop stated:

". . . In my opinion, the *data* that is utilized in this filing *is valid and reliable for rate-making purposes.*" (Emphasis supplied.)

In comparison, the Department presented no testimony by a qualified actuary who could testify that the data utilized in this Filing was not valid and reliable for rate-making purposes. Mr. Kallop's expert testimony as to the immateriality of any possible error in the edited data remains unrefuted and the Commission may not find as untrustworthy uncontradicted testimony or data submitted through competent and unimpeached witnesses. *State ex rel. Commissioner of Insurance v. Rating Bureau*, 292 N.C. 471, *supra.* We note that the instant case is distinguishable from *State ex rel. Commissioner of Insurance v. Rate Bureau*, 41 N.C. App. 310, *supra*, in several ways. First, as has already been explained, Mr. Tatum, a C.P.A., admitted in this case that a C.P.A. was not trained to evaluate loss experience data. Tatum was not competent to testify as to whether or not the statistical procedures applied by the National Council's actuaries to the source data would cull out or make adjustments for any material error that might appear in the source data, nor in fact did Tatum present any testimony which indicated that any such error in the source data did or would actually affect in a material way, the ultimate calculation of reasonable rates submitted by the Rate Bureau. Second, the uncontradicted testimony of Mr. Kallop in this case articulated with great detail how the statistical "editing" used by the National Council would detect source data errors, and how, even if a source data error were undetected, the processing, in-

cluding averaging and weighting, of the source data with time series data, calendar year data, policy year data, and in some instances countrywide data, would negate any *material* effect of such an error and would nonetheless lead to a fair calculation of *reasonable rates.*

We note that the Commissioner had substantial powers to collect any reasonable data it needed concerning the Filing but it did not do so. The Department could have shown that the data used in this Filing was inaccurate if that contention is at all true. First, G.S. § 58-16 authorizes the Commissioner to conduct any examination of the affairs of any company — and we think this includes reports made to the Rate Bureau by companies operating in this State — whenever "he deems it prudent to do so." Under the same section, the Commissioner must examine the companies at least every three years. In addition, G.S. § 58-21 requires each insurance company to file an annual statement with the Commissioner. Mr. Kallop testified, as quoted above, that the data used in this Filing was cross checked with the annual statement filed with the Department and we note that G.S. § 58-22 provides a punishment for intentional false statements made in annual statements filed with the Commissioner. Similarly, G.S. § 58-25 vests in the Commissioner the power to see any record kept by the insurance companies. Also, G.S. § 58-25.1 authorizes the Commissioner to require of any insurer a written and verified answer to any inquiry concerning the transactions and condition of the insurer. Finally, in the event G.S. § 58-16, *supra,* is insufficient, G.S. § 58-124.4 gives the Commissioner powers to require production of records and other information papers "necessary to ascertain the financial condition or legality of conduct" of any insurer, and, under this same section, the Commissioner could hire an actuary, at the carrier's expense, to assist in the examination of the records. Certainly data on loss reserves would be included within the scope of G.S. § 58-16, -124.4.

In sum, the Commissioner's Order does not sufficiently specify, based upon material and substantial evidence (G.S. § 58-9.6(b)(5); G.S. § 150A-51(5)) "in what respect and to what extent," (G.S. § 58-124.21) the rates proposed in this Filing are "excessive" or "discriminatory" (G.S. § 58-124.19(1)).

[4]   Even if the Commissioner's Order were based upon substantial evidence, the action of the Commissioner in requiring audited data in this case was arbitrary and capricious, violated principles of due process and contravened the spirit if not the letter of the North Carolina Administrative Procedure Act. G.S. § 150A-1 to -64. This statement requires some elaboration.

First, the initial 14 November 1978 disapproval notice and order of the Commissioner was made upon an unlawful procedure. G.S. § 150A-51(3). The relevant portion of this notice and order provides:

> ". . . By Orders of December 7, 1977 and February 27, 1978 the Commissioner directed the North Carolina Rate Bureau and the National Council on Compensation Insurance to utilize audited loss experience as the basis of filings. You are hereby directed to furnish affidavits from each company that the reports, sent to the North Carolina Rate Bureau and the National Council on Compensation Insurance, upon which this filing is based were audited by independent auditors, including copies of the audit report and the auditors [*sic*] certification. You are further directed to furnish affidavits from the North Carolina Rate Bureau and the National Council on Compensation Insurance that the reports received from each company, upon which this filing is based, were audited by independent auditors, including copies of the auditor's report and certification. The information above is to be submitted no later than 6 December 1978."

The Order of 7 December 1977 pertained to a filing for workers' compensation rates. That Order, which in part was based upon a finding that loss experience reports were not audited, was vacated by this Court in *State ex rel. Commissioner of Insurance v. Rate Bureau*, 40 N.C. App. 85, *supra*. The Order of 27 February 1978 was affirmed in part by this Court on the auditing issue (Clark, J., dissenting), but that case, now pending appeal to the Supreme Court, pertained to automobile insurance rates and contained a substantially different set of testimony as to the reasonableness of the data used by the National Council on Compensation Insurance. Aside from the *stare decisis* effect of questions of law decided in the appellate opinions, neither the Orders of 7 December 1977 or 27 February 1978 could be binding upon

the Bureau in a subsequent filing. Each was an independent adjudication or rate-making proceeding as contemplated in the Administrative Procedure Act. G.S. § 150A-58(3), (4). Each required separate Findings of Fact. Yet, the Commissioner by his Order of 14 November 1978 purports to give these earlier Orders the effect of a "Rule." While the Commissioner certainly has the authority to issue rules and regulations necessary to carry out its statutory duties, G.S. § 58-9(1), he may not engage in rule making by adjudication, one filing at a time. The Administrative Procedure Act, from which provisions the Commissioner has not been exempted, G.S. § 150A-1(a), specifically sets forth "minimum procedural requirements," G.S. § 150A-9, which require, among other things, notice and the opportunity to be heard before the adoption of a rule. *American Guaranty & Liability Insurance Co. v. Ingram*, 32 N.C. App. 552, 233 S.E. 2d 398, *cert. denied*, 292 N.C. 729, 235 S.E. 2d 782 (1977). In particular, the statute provides:

§ 150A-12. *"Procedure for adoption of rules.*—(a) Before the adoption, amendment or repeal of a rule, an agency shall give notice of a public hearing and offer any person an opportunity to present data, views, and arguments. The notice shall be given within the time prescribed by any applicable statute, or if none then at least 10 days before the public hearing and at least 20 days before the adoption, amendment, or repeal of the rule. The notice shall include:

(1) A reference to the statutory authority under which the action is proposed.

(2) The time and place of the public hearing and a statement of the manner in which data, views, and arguments may be submitted to the agency either at the hearing or at other times by any person.

(3) A statement of the terms or substance of the proposed rule or a description of the subjects and issues involved, and the proposed effective date of the rule."

These procedures were not followed before the Order of 14 November 1978 was issued. Nor was the "Rule" filed and published as required by G.S. § 150A-59 and § 150A-63.

Second, the order was arbitrary and capricious, G.S. § 150A-51(6), in that the order was unreasonably vague. No in-

dication was made, for example, as to whether both national and state data should be audited, whether a complete audit as opposed to a statistical audit was required, how far back the auditing must go, what statistical techniques, if any, and what sample sizes and various factors were to be used, and whether actuaries or accountants or both must conduct the audit.

Third, under the facts of this case, the order was arbitrary and capricious in that it imposes an unreasonable burden upon the North Carolina Rate Bureau to have to audit all the back records from workers' compensation companies in the nation over an unspecified period of time, particularly since no hearing was held in which the extent of this burden and the time and the cost considerations would be aired. It is one thing to require, in the future, that companies operating in North Carolina have independent audits of their reports to the Rate Bureau; it is quite another to require that all past data, particularly countrywide data be audited. The latter is patently unreasonable. In this regard it is interesting that the recent legislation amending G.S. § 58-124.20, not binding on this case, provides the Commissioner specific authority to require the filing of certain supporting data but *not* "with respect to business written prior to January 1, 1980." 1979 N.C. Adv. Legis., Serv., c. 824, sec. 2(e) (1979); that is, the legislature specifically rejected retroactive application of record keeping requirements.

The overall manner in which the Commissioner has handled the issue of auditing offends traditional notions of substantial justice and fairness and thus deprives the Bureau of the quintessential elements of due process.

Consequently, the Commissioner also erred in charging that the Rate Bureau acted dilatorily and in bad faith in not providing certain data. We have already found the Commissioner's action to be unreasonable. It naturally follows that the Rate Bureau acted properly in refusing to comply while registering its formal objection to the Commissioner's requests.

## II.

[5]   The Bureau's next contention is that the Commissioner erred in requiring investment income on invested capital to be taken into consideration in the rate-making formula. We agree. Quite

simply, stock companies with a conservative dividend policy would be penalized under such a requirement because interest income on their retained earnings or any "excess reserves" the company might have would be translated into a lower underwriting margin allowed on total premiums. In contrast, companies which kept their shareholders equity to a minimum would be allowed higher percentages because they would have less investment income to be considered in the calculation. Such a policy would discourage prudent financial management.

It is fundamental to recognize that insurance underwriters in this State are regulated in a different way than are utilities. Utilities are capital intensive and investors are allowed a fair return on their capital. In contrast, insurance underwriters provide a "service," and it has long been the rule in this State that it is more appropriate that allowable profit levels be ascertained by specifying an appropriate percentage of total premiums—their "underwriting margin." *In re Filing By Automobile Rate Office*, 278 N.C. 302, 314-315, 180 S.E. 2d 155 (1971); *In re Filing By Fire Insurance Rating Bureau*, 275 N.C. 15, 38, 165 S.E. 2d 207 (1969); *State ex rel. Commissioner of Insurance v. State ex rel. Attorney General*, 19 N.C. App. 263, 267-68, 198 S.E. 2d 575, *cert. denied*, 284 N.C. 252, 200 S.E. 2d 659 (1973). *See also Commissioner of Insurance v. Attorney General*, 16 N.C. App. 724, 729, 193 S.E. 2d 432 (1972).

Our decision in *State ex rel. Commissioner v. Rate Bureau*, 40 N.C. App. 85, *supra*, in which we held that it was proper for the Commissioner to consider investment income on unearned premium reserves and loss reserves, in no way extended to investment income on investor capital. Nor was such a result intended by the inadvertent use of the language "capital invested by insurer" in the majority opinion of *State ex rel. Commissioner of Insurance*, 41 N.C. App., *supra*, at 318. We now expressly hold that it is not proper for the Commissioner to consider investment earnings on capital invested by insurers in reviewing the rate-making formula proposed by the Rate Bureau.

We note that this result is also consistent with the recent amendment to G.S. § 58-124.19(2) which expressly allows consideration of investment income on unearned premiums and loss reserves but conspicuously leaves out investment income on investor capital. 1979 N.C. Adv. Legis. Serv., c. 824, sec. 1.

### III.

[6]  Counsel for the State conceded in oral argument that the Commissioner erred in finding that the proposed rate increase was in violation of federal wage and price guidelines. We agree with counsel. First, the wage and price guidelines were not promulgated until approximately two weeks after the filing became effective. In addition the guidelines were only voluntary. We do not need to reach the question of whether the Commissioner's disapproval upon this ground is an appropriate "judgment factor" under G.S. § 58-124.19(2).

### IV.

[7]  We agree with the Bureau that the Commissioner erred in finding that the Filing did not take into account the effect of the average 28.4% increase put into effect 1 February 1978. Indeed, the State conceded this point in its brief. Both Mize and Kallop testified for the Bureau that the increase was included in this Filing. There is absolutely no evidence in the record to support the Commissioner's finding.

### V.

As we have already held that the Commissioner's findings of fact on the auditing issue were not backed by substantial evidence in the record, we do not need to consider whether the Commissioner improperly admitted both the testimony of Dr. William Fairley at a prior hearing and the *North Carolina Work Injury* exhibits.

The Rate Bureau's contentions concerning adoption of Dr. Fairley's profit theory, the burden of proof, use of countrywide data, and stock company expense data have already been resolved in the Bureau's favor by our earlier opinion in 40 N.C. App. 85, *supra.*

### VI.

The Commissioner's Order disapproving the Filing by the Rate Bureau is vacated, and the rates proposed in the 12 October 1978 filing by the Rate Bureau are deemed approved, and remain in effect until changed as by law provided, and the reserved funds placed by the member insurance companies in the escrow account

pursuant to G.S. § 58-124.22(b) shall be remitted with interest to the member insurers by the escrow agents.

Vacated.

Judge ERWIN concurs and files concurring opinion.

Judge ARNOLD concurs in part and dissents in part and files opinion.

Chief Judge MORRIS concurs in this opinion for the sole purpose of clarifying the holding of this Court in *State ex rel. Commissioner of Insurance*, 41 N.C. App., *supra*, at 318, pertaining to investment income on investor capital as a factor to be considered in rate-making. Clark, J., and Arnold, J., the other two judges on the panel in that case, are on the panel in the case *sub judice*.

Judge ERWIN concurring.

The record in the instant case provides forceful and compelling reasons to vacate the order entered by the Commissioner as stated in the opinion. The testimony of William B. Fairley given in a prior case was considered by the Commissioner. Fairley did not appear as a witness in the case *sub judice*. The Rate Bureau did not have an opportunity to cross-examine him as to the issues in this case. In the case of *Commissioner of Ins. v. Rate Bureau*, 44 N.C. App. 75, 259 S.E. 2d 926 (1979), No. 7910INS58, I dissented from the majority opinion which vacated the order of the Commissioner. In comparing the two cases, I find a marked distinction compelling the vacating of the order in the instant case which did not appear of record in *Commissioner of Ins. v. Rate Bureau, supra*.

Judge ARNOLD dissenting.

I concede that the Commissioner appears to have disregarded the greater weight of the evidence, and the better logic, in the instant case by disregarding Mr. Kallop's testimony. However, I dissent from the majority's holding that there is no substantial evidence to support the Commissioner's conclusion that the

unaudited data was unreliable. Mr. Tatum's statement that a "CPA is not trained to *determine or evaluate the reserves*" (emphasis added) does not lead to the conclusion that a CPA is therefore unqualified to give an opinion concerning the reliability of unaudited reports and whether they are an appropriate basis on which to base future projections.

In summary, while I do not agree with the conclusion reached by the Commissioner, I cannot hold that there is no evidence to support it. On this point only, and such legal conclusions as follow, I dissent.